**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

FILED
4/24/2023
Court of Appeals
Division I
State of Washington

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ALETA THOMPSON,<br><br>               Respondent,<br><br>               v.<br><br>AMAZON.COM INC., a Delaware corporation,<br><br>               Appellant. | No. 84066-5-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

BIRK, J. — Aleta Thompson, a stockholder of Amazon.com Inc., a Delaware corporation headquartered in Seattle, sued under the Delaware General Corporation Law, Delaware Code title 8, § 220(b)-(c) (Section 220), to compel inspection of Amazon's corporate books and records. Thompson seeks to investigate possible wrongdoing by Amazon in violating privacy laws "including" the Illinois Biometric Information Privacy Act (BIPA), 740 Illinois Compiled Statutes (Ill. Comp. Stat.) 14/1-14.99. This claim requires that Thompson establish a "credible basis" that Amazon engaged in wrongdoing. Thompson relies on four lawsuits that others filed against Amazon accusing it of violating BIPA, together with certain admissions Thompson attributes to Amazon. After the superior court allowed inspection, the lawsuit on which Thompson principally relies was resolved in Amazon's favor on summary judgment. Because the record is now insufficient to establish a credible basis of wrongdoing, we vacate the superior court's inspection order and remand with instructions to dismiss Thompson's complaint.

No. 84066-5-I/2

I

A

On July 14, 2020, two plaintiffs filed a putative class action lawsuit against Amazon designated Class Action Complaint, <u>Vance v. Amazon.com, Inc.</u>, No. C20-cv-01084-JLR (W.D. Wash.). The complaint alleged facial recognition technology is increasingly used by "[p]ublic and private entities" to identify individuals. The complaint described this as concerning for individual privacy and because of the inaccuracy of facial recognition software currently available, especially in correctly identifying women and people of color. The complaint alleged Amazon offers a facial recognition product known as "Rekognition."

The <u>Vance</u> complaint described the *Gender Shades* study on the accuracy of facial recognition products.[1] The complaint alleged the *Gender Shades* study found that "each product more accurately classified: (a) males than females; and (b) lighter individuals than darker individuals." The <u>Vance</u> complaint alleged this study found that Rekognition "had an error rate of 31.37% with respect to identifying dark-skinned females, as opposed to an error rate of 0.00% with respect to identifying light-skinned males." It alleged, "In the aftermath" of the *Gender Shades* study, International Business Machines Corporation (IBM) released "a new dataset consisting of one million images" whose purpose was to assist in "improving the ability of facial recognition systems to fairly and accurately identify all individuals." The complaint referred to this as the "Diversity in Faces" dataset.

---

[1] Joy Buolamwini & Timnit Gebru, <u>Gender Shades: Intersectional Accuracy Disparities in Commercial Gender Classification</u>, 18 PROC. MACH. LEARNING RSCH. 1 (2018) [https://perma.cc/U5SD-H7A9].

2

IBM's Diversity in Faces dataset had been culled from a larger dataset. Flickr, described as a photo-sharing website, compiled approximately 100 million photographs posted by its users into a dataset that it made publicly available. The Vance complaint alleged Flickr did so "without informing or receiving the consent of the individuals who uploaded the[] photographs to Flickr or who appeared in the[] photographs." In creating the Diversity in Faces dataset from the Flickr release, IBM reportedly scanned the facial geometry of each image to create a comprehensive set of data about facial features. The Vance complaint alleged IBM "did not seek or receive permission" from "Plaintiffs or Class Members" to include "their" images in the Diversity in Faces dataset. It alleged IBM made the Diversity in Faces dataset available to other companies that developed, produced, marketed, sold, or otherwise used facial recognition products. Amazon downloaded the Diversity in Faces dataset.

The Vance plaintiffs asserted claims under BIPA. They alleged they were two residents of Illinois, who had, in Illinois, uploaded to Flickr photographs of themselves and others, which were subsequently incorporated into IBM's Diversity in Faces dataset, and which were subsequently downloaded by Amazon without their authorization. They alleged Amazon "profited from the biometric identifiers and information contained in the Diversity in Faces" dataset because that information "allowed Amazon to improve its facial recognition products and technologies."

3

No. 84066-5-I/4

In orders entered on March 15, 2021 and April 14, 2021, the court hearing the Vance matter denied Amazon's motion to dismiss the BIPA claims pursuant to Federal Rule of Civil Procedure (Fed. R. Civ. P.) 12(b)(6). Vance v. Amazon.com Inc., 525 F. Supp. 3d 1301, 1316 (W.D. Wash. 2021); Vance v. Amazon.com Inc., 534 F. Supp. 3d 1314, 1329 (W.D. Wash. 2021). The court first addressed Amazon's argument that its use of the Diversity in Faces dataset did not occur in Illinois, such that it was not subject to BIPA. Vance, 525 F. Supp. 3d at 1309. Observing the plaintiffs "[did] not allege where Amazon obtained the dataset," the court ruled, "more discovery is needed to explore whether and to what extent Amazon's alleged acts involving the Diversity in Faces dataset occurred in Illinois." Vance, 525 F. Supp. 3d at 1308-09. The court concluded, if BIPA applied, the allegations that Amazon downloaded the Diversity in Faces dataset were sufficient to fall within Section 15(b) of BIPA, which is triggered when a person " 'otherwise obtain[s]' " biometric data. Id. at 1312 (alteration in original) (quoting 740 Ill. Comp. Stat. Ann. 14/15(b)). In the second order, the court concluded the Vance plaintiffs' allegations "support the inference that Amazon received some benefit from the biometric data through increased sales of its improved products," and were sufficient to state a claim under Section 15(c) of BIPA providing that "[n]o private entity' " may " 'otherwise profit' " from biometric data. Vance, 534 F. Supp. 3d at 1321, 1324 (quoting 740 Ill. Comp. Stat. Ann. 14/15(c)).

B

By letter dated October 8, 2021, Thompson submitted a demand for inspection of Amazon's books and records under Section 220. Thompson stated

4

her proper purpose was "to investigate potential corporate mismanagement, wrongdoing, and waste" by Amazon fiduciaries. Thompson described the wrongdoing she suspected as Amazon's unauthorized collection and use of individuals' information in violation of state privacy laws.[2] Thompson described concerns expressed by government agencies and privacy groups over the use of facial recognition software increasing the risk of identity theft, clandestine tracking or government surveillance, and erroneous identification. Thompson's demand substantially echoed the Vance allegations concerning Rekognition, the *Gender Shades* study, misidentification of females and dark-skinned individuals, IBM's creation of the Diversity in Faces dataset, IBM's culling that dataset from the Flickr release, IBM's scanning the facial geometry of the culled images, IBM's and Flickr's acting without consent of those who had uploaded the images or who had been photographed, IBM's making the database available to other companies, and Amazon's downloading the Diversity in Faces dataset. Thompson asserted a "federal consumer class action lawsuit" had been filed against Amazon in the U.S. District Court for the Western District of Washington "alleging that Amazon unlawfully obtained and used [the plaintiffs'] biometrics information and identifiers." Thompson asserted the U.S. District Court had denied Amazon's motion to dismiss the action on the ground the plaintiffs had "sufficiently stated claims" under BIPA and "Amazon faces significant liability in this action."

---

[2] Thompson's briefing and evidence does not identify any specific privacy law that Amazon allegedly violated other than BIPA.

5

Thompson demanded inspection of 10 categories of documents generally concerning Amazon's "biometrics identifier collection processes, including, without limitation, its facial recognition software."  Amazon did not allow inspection in response to Thompson's demand.  Thompson filed this action to compel inspection under Section 220 in King County Superior Court.[3]  The parties agree Thompson is an Amazon stockholder and Amazon is a Delaware corporation.

At trial, Thompson relied on the allegations in Vance, together with its having survived dismissal, as her support for the statements in her Section 220 demand concerning biometric information, the *Gender Shades* study, the Flickr dataset, the IBM Diversity in Faces dataset, and Amazon's alleged use of and profit from the Diversity in Faces dataset.  Thompson submitted three other lawsuits to support her Section 220 demand.  In Naughton v. Amazon.com, Inc., which also survived a motion to dismiss, an Amazon employee at a warehouse in Joliet, Illinois alleged that during the COVID-19 pandemic Amazon required wellness checks that "included scans of Naughton's facial geometry," during which Amazon collected "sensitive biometric data" without consent and disclosed it to other parties in violation of BIPA.[4]  20-cv-6485, 2022 WL 19324, at *1 (N.D. Ill. Jan. 3, 2022).  In Reid v. Amazon.com, Inc., the plaintiff alleged Amazon surreptitiously collected

---

[3] Thompson originally pleaded a second claim under the Washington Business Corporations Act, chapter 23B.16 RCW, but Thompson voluntarily dismissed this claim and only her Section 220 claim remains at issue.

[4] Naughton was later recaptioned.  Order Granting Second Amended Complaint, No. 20-cv-6485 (N.D. Ill. Jan. 13, 2022) (amended for the sole purpose of substituting Cynthia Redd for Naughton); Redd v. Amazon.com, Inc., No. 20-cv-06485, 2022 WL 705899 (N.D. Ill. Jan. 13, 2022) (second amended complaint). For consistency we refer to the action as "Naughton."

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

voiceprints of users of certain of its products, in violation of BIPA. No. 21-cv-06010 (N.D. Ill. Nov. 9, 2021) (Class Action Complaint).

Last, Thompson submitted the complaint in Nelson v. Bezos, a stockholder derivative action filed on behalf of Amazon as nominal defendant three days before trial on Thompson's Section 220 claim. No. 22-cv-00559, 2022 WL 1238248 (W.D. Wash. Apr. 26, 2022). The Nelson complaint bases fiduciary, waste, and unjust enrichment claims on alleged unlawful conduct exposing Amazon to multiple class action lawsuits under BIPA. In a supplemental brief in the superior court, Thompson relied on Nelson's venue in the Western District of Washington as a reason why the court should not condition any inspection of books and records on future litigation occurring in Delaware, without pointing to its allegations as further evidence supporting Thompson's claims of wrongdoing. The Nelson complaint alleged Amazon was exposed to "at least fourteen separate class action lawsuits for violation of BIPA," Amazon had faced over 75,000 arbitration demands alleging privacy violations by devices, and Amazon's Securities Exchange Commission (SEC) filings omitted or understated risks posed by Amazon's alleged possession and use of biometric information in light of its potential liability under BIPA, including in Vance.

In its answer to Thompson's complaint, Amazon admitted, "IBM issued a blog post announcing the release of the Diversity in Faces Dataset." Amazon admitted it downloaded the Diversity in Faces dataset via links provided by IBM. And it admitted the dataset included "links to certain photographs from Flickr and various metadata about those photographs, including the username of the Flickr

7

user who uploaded the photo, the date the photo was taken, the date the photo was uploaded, and, where available, geolocation data."

C

The parties agreed Delaware law governs Thompson's Section 220 claim. Thompson initially sought a merits determination of her Section 220 claim by obtaining an ex parte order to show cause why Amazon should not permit inspection. Amazon moved to dismiss Thompson's complaint. The superior court ultimately did not adjudicate Thompson's Section 220 claim through a show cause procedure and Amazon withdrew its motion to dismiss. Following the practice of the Delaware Court of Chancery, the superior court set the matter for an expedited bench trial on affidavits to determine the merits of Thompson's Section 220 claim.[5]

The superior court entered "Findings of Fact, Conclusions of Law, and Final Order and Judgment Allowing Inspection." In support of its finding that Thompson had shown a credible basis that Amazon had engaged in wrongdoing, the superior court pointed to Vance and the fact it had survived dismissal. The court acknowledged "[n]o independent report of a third party substantiat[ed] the allegations" in Vance, and there was "no government investigation into whether

---

[5] This is an appropriate procedure for a Washington court to follow when adjudicating a Section 220 claim. Cf. Jacob v. Bloom Energy Corp., No. 2020-0023-JRS, 2021 WL 733438, at *1 (Del. Ch. Feb. 25, 2021) (determining Section 220 claim based on one-day trial on paper record). When a claim is determined under the substantive law of another jurisdiction, we generally apply Washington procedural law. See Boudreaux v. Weyerhaeuser Co., 10 Wn. App. 2d 289, 313 n.14, 448 P.3d 121 (2019). The superior court appropriately adopted a procedure reflecting that Section 220 proceedings "are intended to be 'summary,' and thus 'managed expeditiously.' " AmerisourceBergen Corp. v. Lebanon County Emps.' Ret. Fund, 243 A.3d 417, 437 (Del. 2020). An expedited discovery plan and trial on a Section 220 claim may be requested through a motion under CR 16.

8

Amazon has violated BIPA." The superior court viewed <u>Vance</u> as supporting a violation "potentially affecting a significant number of the public."

After the superior court's final judgment, but before oral argument in this court, the Western District of Washington resolved <u>Vance</u> in favor of Amazon on summary judgment. <u>Vance v. Amazon.com, Inc.</u>, No. C20-1084JLR, 2022 WL 12306231 (W.D. Wash. Oct. 17, 2022). The summary judgment order was based on the testimony of an IBM researcher and seven Amazon employees[6] who were engaged in research to improve the accuracy of Rekognition and who had worked with the Diversity in Faces dataset. <u>Id.</u> at *2-5. Amazon employees in California contacted IBM about the Diversity in Faces dataset stating they were interested in the dataset for research and internal testing. <u>Id.</u> at *3. After Amazon employees in California obtained a link to download the dataset, an Amazon employee in Seattle downloaded version 1A of the Diversity in Faces dataset to an Amazon data center in Oregon. <u>Id.</u> Amazon employees in Seattle and California concluded that version 1A of the dataset was not suitable for their research purposes and did not make further use of it. <u>Id.</u> at *4. Another Seattle Amazon employee examined the dataset and concluded it would not be useful for research before he transferred to Berlin, Germany. <u>Id.</u> An Amazon employee in Seattle downloaded version 1B of the Diversity in Faces dataset. <u>Id.</u> An Amazon employee in Atlanta reviewed

---

[6] At trial in this matter, Amazon submitted declarations by five of these witnesses, which it had filed in support of its summary judgment motion in <u>Vance</u>. As reflected both in our record and in the <u>Vance</u> summary judgment order, the <u>Vance</u> court initially struck Amazon's motion for summary judgment without prejudice to permit the plaintiffs to depose the witnesses on whose testimony Amazon relied. 2022 WL 12306231, at *5.

9

No. 84066-5-I/10

version 1B and determined it was not suitable for her research purposes. Id. at *5. By the time of the testimony in Vance, Amazon had deleted its known copies of the Diversity in Faces dataset. Id. at *4-5. The Amazon employees testified that to their knowledge Amazon did not use the Diversity in Faces dataset to train Rekognition or integrate any information from it into any Amazon product. Id.

Based on this evidence, the court dismissed the Vance plaintiffs' BIPA claims on extraterritoriality grounds because "any connection between Amazon's conduct and Illinois is too attenuated for a reasonable juror to find that the circumstances underlying Amazon's alleged BIPA violations 'occurred primarily and substantially in Illinois.' " Id. at *8 (quoting Avery v. State Farm Mut. Auto. Ins. Co., 216 Ill. 2d 100, 187, 835 N.E.2d 801 (2005)). The court granted Amazon summary judgment on the Vance plaintiffs' claims for unjust enrichment because they "present[ed] only speculation—rather than evidence—that Amazon somehow used the [Diversity in Faces] Dataset to improve its Rekognition product." Vance, 2022 WL 12306231, at *9.

II

At oral argument, Thompson argued we should not consider the Vance summary judgment order, because it is outside the record presented to the superior court.[7] The parties have not cited and we have not found a Delaware decision answering whether a reviewing court may consider developments

---

[7] Wash. Court of Appeals Oral Argument, Thompson v. Amazon.com, Inc., No. 84066-5-I (Jan. 11, 2023), at 9 min., 42 sec. to 10 min., 13 sec., *https://tvw.org/video/division-1-court-of-appeals-2023011180/?eventID=2023011180.*

10

occurring after a trial court has entered final judgment ordering inspection under Section 220. We conclude Delaware law would likely allow this court to consider the Vance summary judgment order.

Delaware law permits the Court of Chancery when evaluating a Section 220 demand to consider developments occurring after the stockholder submitted the demand. In Oklahoma Firefighters Pension & Retirement System v. Amazon.com, Inc., No. 2021-0484-LWW, 2022 WL 1760618, at *4 (Del. Ch. June 1, 2022) (unpublished),[8] the company produced documents responsive to a demand, and the stockholder requested additional documents relating to alleged anticompetitive practices and alleged tax law violations. Two events occurring after the demand was served were a focus at trial: (1) a lawsuit filed by the Attorney General for the District of Columbia against the company for alleged violations of the District of Columbia Antitrust Act, and (2) a report that Italy's antitrust regulator had fined the company. Id. at *5. By the time of the decision of the Court of Chancery, but before entry of final judgment, the District of Columbia litigation had been dismissed, and the court relied on this among other reasons in denying the stockholder's demand for further inspection. Id. at *9-10, 14.

The Court of Chancery has indicated the basis for allowing a stockholder to rely on events occurring after a Section 220 demand is "that the plaintiff may point

---

[8] Under GR 14.1(b), the parties may cite unreported Delaware decisions if permitted under Delaware law. "Delaware courts give such opinions substantial precedential weight." Crystallex Int'l Corp. v. Petroleos De Venezuela, SA, 879 F.3d 79, 85 n.8 (3d Cir. 2018) (citing Aprahamian v. HBO & Co., 531 A.2d 1204, 1207 (Del. Ch. 1987) (alteration in original) ("An unreported decision [is] entitled to great deference")).

to those actions (if relevant) to bolster her showing of proper purpose." <u>Sutherland v. Dardanelle Timber Co., Inc.</u>, No. CIV.A. 671-N, 2005 WL 1074357, at *2 (Del. Ch. Apr. 25, 2005). <u>Sutherland</u> distinguished a case in which a company answered a Section 220 demand with a pretextual defense, which the Court of Chancery relied on as some evidence supporting the credibility of the stockholder's assertion of wrongdoing. <u>Id.</u> at *1. In contrast, <u>Sutherland</u> rejected use of this principle in Section 220 litigation to justify pretrial discovery seeking information merely damaging to the company's credibility. <u>Id.</u> at *1-2.

To the extent Delaware law discloses a rationale for allowing consideration of events occurring after a Section 220 demand when determining the merits of subsequent litigation, the Delaware Supreme Court would likely allow consideration of the <u>Vance</u> summary judgment order here. If the purpose of looking to later events is that they may add to the credibility of the assertion of wrongdoing in a Section 220 demand, the converse is appropriately considered when later events detract from its credibility. When a stockholder rests a Section 220 demand on allegations in another lawsuit, the credibility of the demand is informed by the success of the lawsuit in establishing wrongdoing. A stockholder relying on another lawsuit's surviving dismissal is relying on the official act of the court as bolstering the stockholder's reason to believe wrongdoing may have occurred. A stockholder must take this, also, subject to the court's subsequent official acts, such as a final judgment determining the wrongdoing did not occur.

No. 84066-5-I/13

We conclude it is appropriate to consider the Vance summary judgment order to the extent it bears on the legal sufficiency of Thompson's Section 220 demand. Generally, an appellate court reviews a trial court's Section 220 determination using a "highly deferential" abuse of discretion standard of review. Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW, 95 A.3d 1264, 1271-72 (Del. 2014). Rather than remanding for the trial court to consider a changed record in the first instance, this court has discretion to address an argument raised for the first time on review asserting a "failure to establish facts upon which relief can be granted." Roberson v. Perez, 156 Wn.2d 33, 40-41, 123 P.3d 844 (2005). We treat Amazon's reliance on the Vance summary judgment order as such an argument. Accordingly, we review the superior court's record, considering the additional fact that Vance was resolved in Amazon's favor, and we ask whether the record as it stands now suffices to "establish facts upon which relief can be granted" under Delaware law. RAP 2.5(a)(2).

III

"One of the most traditional proper purposes for a [Section] 220 demand is the investigation of possible wrongdoing by management." KT4 Partners LLC v. Palantir Techs. Inc., 203 A.3d 738, 758 (Del. 2019). "Such investigations are proper, because where the allegations of mismanagement prove meritorious, investigation furthers the interest of all stockholders and should increase stockholder return." Seinfeld v. Verizon Commc'ns, Inc., 909 A.2d 117, 121 (Del. 2006). A stockholder making a Section 220 claim for this purpose "need only show, by a preponderance of the evidence, a credible basis from which the Court of

13

Chancery can infer there is possible mismanagement that would warrant further investigation." Id. at 123. There is no need to show the wrongdoing or mismanagement is actionable. AmerisourceBergen Corp. v. Lebanon County. Employees' Ret. Fund, 243 A.3d 417, 431 (Del. 2020). The "stockholder is not required to prove that wrongdoing occurred, only that there is 'possible mismanagement that would warrant further investigation.' " Id. at 432 (footnote omitted) (quoting Sec. First Corp. v. U.S. Die Casting & Dev. Co., 687 A.2d 563, 568 (Del. 1997)). This standard has been called "the lowest possible burden of proof," yet it is "not insubstantial" and demands more than " 'mere suspicion.' " Seinfeld, 909 A.2d at 123. The standard " 'may be satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing.' " Id. (quoting Sec. First Corp., 687 A.2d at 568).

A

Thompson relies on Hightower v. SharpSpring, Inc., which stated, "When evaluating whether a credible basis exists, the court may consider ongoing lawsuits, investigations, circumstantial evidence, and even hearsay statements evincing possible wrongdoing." No. 2021-0720-KSJM, 2022 WL 3970155, at *7 (Del. Ch. Aug. 31, 2022). Emphasizing that Vance survived a motion under Fed. R. Civ. P. 12(b)(6), Thompson relies on the statement in Pettry v. Gilead Sciences, Inc. that "[t]he federal motion-to-dismiss standard is higher than Section 220's credible basis standard," as a result of which "[i]t follows that allegations which survive a motion to dismiss under the federal standard are sufficient to meet the credible basis standard." No. 2020-0132-KSJM, 2020 WL 6870461, at *13 (Del.

14

Ch. Nov. 24, 2020).  Thompson argues her reliance on other lawsuits is buttressed by Amazon's admissions in this case, citing Jacob v. Bloom Energy Corp., in which a company's "reactive filing" of an amended Form 8-K with the SEC provided "some credence to [the stockholder's] concern regarding the robustness of [the company's] independent controls on their financial reporting."  No. 2020-0023-JRS, 2021 WL 733438, at *7 (Del. Ch. Feb. 25, 2021).  From these decisions, Thompson reasons the existence of one or more lawsuits surviving a Fed. R. Civ. P. 12(b)(6) motion, coupled with a company's supportive admissions, satisfies Section 220's credible basis standard.  We agree Delaware courts consider other lawsuits in evaluating Section 220 claims, but we disagree these decisions support inspection on the record Thompson has offered.

In Hightower, the court commented that "ongoing lawsuits" among other types of "investigations" could support a Section 220 claim.  2022 WL 3970155, at *7.  Hightower's examples cited in support of this proposition involved evidence-based investigations supporting wrongdoing, such as where " 'governmental agencies or arms of law enforcement have conducted the investigations,' " among other things.  Id. at *7 n.79 (quoting Lebanon County Emps.' Ret. Fund v. AmerisourceBergen Corp., No. 2019-0527-JTL, 2020 WL 132752, at *9 (Del. Ch. Jan. 13, 2020), aff'd, 243 A.3d 417 (Del. 2020)).  But Hightower did not involve or further discuss the circumstances in which other lawsuits can support a Section 220 claim.  Id. at *7.

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Pettry and Jacob involved Section 220 claims based in part on other lawsuits. In Pettry, the company was accused of manipulating the market for HIV (human immunodeficiency virus) drugs, with the stockholders seeking inspection "join[ing] in chorus with a host of other accusers." 2020 WL 6870461, at *1. These "other accusers" included persons living with HIV, activists, regulatory agencies, the Department of Justice, and Congress. Id. At the time of the Section 220 trial, the company was "the subject of at least 250 tort actions pending in state and federal courts in California, Delaware, and Florida." Id. at *6. An antitrust complaint spanning 134 pages reflected "significant research" describing "three broad categories of conduct that allegedly delayed the entry of generic competition" to the company's drug. Id. at *12. The antitrust complaint described how specific agreements between the company and others impeded entry into the market of generic drugs that would compete with the company's products. Id. Pettry was supported by a mass tort action on behalf of 15,000 claimants, analysis of the company's patent filings, the company's public statements, statistics corroborated by the Centers for Disease Control and Prevention, studies conducted by third parties, Food and Drug Administration findings, a lawsuit by the U.S. government claiming infringement of Centers for Disease Control and Prevention patents, Congressional testimony, and internal e-mails. Id. at *7, *13-14.

It was in reference to the antitrust complaint's surviving a Fed. R. Civ. P. 12(b)(6) motion that Pettry described the standard as being higher than Section 220's credible basis standard. Id. at 13. The Fed. R. Civ. P. 12(b)(6) standard is

a pleadings standard under which factual matter is "accepted as true." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). In contrast, the credible basis standard under Section 220 is an evidentiary standard. It is a relaxed one, e.g. NVIDIA Corp. v. City of Westland Police & Fire Ret. Sys., 282 A.3d 1, 22 (Del. 2022) ("hearsay is admissible in a Section 220 action if it is sufficiently reliable"), but still one dependent on "a preponderance of the evidence," Seinfeld, 909 A.2d at 123. Although Pettry alluded to the federal pleading standard, the focus of its discussion was not on court pleadings in and of themselves but on the evidence described in the referenced lawsuits and investigations. Pettry is best understood as comparing the persuasiveness demanded by the respective standards, rather than the manner in which each must be met.

In Jacob, the collateral lawsuit was a class action on behalf of company stockholders asserting the company had misled investors by among other things misreporting its financial performance and misrepresenting the performance of the company's main product. 2021 WL 733438, at *3. The lawsuit was based substantially on a report by a short-seller—an interested party—piecing together the performance deficiencies of the company's product based on "news reports, [the company's] securities disclosures, data on the Company's Energy Servers made publicly available on state government websites, prior lawsuits and interviews with [company] customers and expert witnesses." Id. at *2. This was supported by appendices describing the report's methodology, collected data, and the means to replicate its analysis. Id. The court did not stop at the litigation

17

posture of the allegations against the company, but relied on the lawsuit and the short-seller's report showing that "[p]ublic data . . . sourced from various state governments' utility records and made available through state government websites," suggested the company "understated in public disclosures the rate at which its fuel cells degrade." Id. at *6. The information was attributed to the company's business clients and experts in its technology. Id.

Thompson additionally cites In re UnitedHealth Group, Inc. Section 220 Litigation, No. 2017-0681-TMR, 2018 WL 1110849 (Del. Ch. Feb. 28, 2018), aff'd sub nom. UnitedHealth Grp. Inc. v. Amalgamated Bank, 196 A.3d 885 (Del. 2018). There, the former director of finance at a UnitedHealth subsidiary filed a qui tam action, alleging that for at least a decade, UnitedHealth violated the False Claims Act, 31 U.S.C. §§ 3729-3733, by improperly upcoding risk adjustment data and failing to delete incorrect diagnosis codes, resulting in overpayments by Medicare. Id. at *2. The Department of Justice intervened, basing its allegations on a five year investigation entailing depositions of 20 UnitedHealth employees and UnitedHealth's production of over 600,000 documents, including internal e-mails, letters, audit reports, charts, attestations, policies, presentation materials, and memoranda. Id. Stockholders proceeding under Section 220 pointed to the Department of Justice's allegations and voluminous documents and testimony cited and attached to the Department of Justice complaint. Id. at *3-*6. The court noted that while a complaint alone may not show a credible basis, the Department of Justice complaint and qui tam action were based on extensive, documented investigation. Id. at *7.

18

No. 84066-5-I/19

Delaware courts have held other litigation does not necessarily establish a credible basis. Oklahoma Firefighters explained, "Delaware law does not—as the plaintiff suggests—provide that evidence of open inquiries and lawsuits alone necessarily begets a credible basis from which the court can infer possible mismanagement." 2022 WL 1760618, at *6. If the mere fact of other pending litigation satisfied Section 220, stockholders would improperly be "relieved of their burden of 'show[ing] *some evidence* of possible wrongdoing.' " Id. at *7 quoting Seinfeld, 909 A.2d at 123). Referring to some of the authorities relied on by Thompson and discussed above, the court said, "Delaware courts have routinely looked to some additional evidence beyond ongoing inquiries or litigation," noting considerations such as "the scale of investigations and lawsuits, the severity or results of those inquiries, and corporate trauma" as providing the necessary indication of potential wrongdoing. Id.

The significance of a concluded lawsuit was addressed in Louisiana Municipal Police Employees' Retirement System v. Lennar Corp., in which the court held that news articles reporting an industry-wide investigation by government agencies concerning compliance with the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-219 (2006) (FLSA), together with past lawsuits alleging violations of the FLSA, were insufficient to support a Section 220 claim. No. 7314-VCG, 2012 WL 4760881, at *1 (Del. Ch. Oct. 5, 2012). Between 2007 and 2009, several employees alleged Lennar misclassified them as exempt from the FLSA to avoid paying overtime. Id. The lawsuits settled. Id. In 2011, the Wall Street Journal published articles stating governmental agencies were investigating

19

certain employers' compliance with the FLSA, including Lennar. Id. The court concluded the settled lawsuits did not justify further investigation, and even with the Wall Street Journal articles considered as well, taken together, "the probative value of each item is so negligible that combining them is of no consequence." Id. at *4-5.

Delaware courts in Pettry, UnitedHealth, and Jacob, concluded the information described in other lawsuits credibly supported the possibility that the company was engaged in the alleged wrongdoing. The lawsuits on which Thompson relies do not describe specific information, or specific sources of information, about how Amazon used the Diversity in Faces dataset beyond the admitted fact Amazon downloaded it. They do not describe any specific information that Amazon otherwise violated BIPA or any other law. The evidence described in the Vance summary judgment order—the depositions of the Amazon employees who used the Diversity in Faces dataset—demonstrates that Amazon did not use the Diversity in Faces dataset in a manner subject to or violating BIPA. Thompson's position before the superior court was that Amazon faced "massive exposure" from Vance. This cannot be sustained now that Amazon has prevailed in Vance.

Naughton, Reid, and Nelson, also, lack specific information that Amazon violated any law. Naughton concerns a distinct allegation of wrongdoing—alleged collection of employee information at an Illinois warehouse—but without stating any information beyond an allegation that that is occurring. The Naughton complaint says, for instance, "Amazon collects, captures, or otherwise obtains and

stores Plaintiff's biometric data." But it describes no information supporting that this is true other than simply stating it. Thompson did not show that <u>Reid</u> survived a motion to dismiss, the superior court did not rely on this complaint, and neither party mentions it in their briefs in this court. Similarly, Thompson did not show that <u>Nelson</u> survived a motion to dismiss, and did not point to it as evidence of wrongdoing.

Thompson is not necessarily required to support her Section 220 demand with the scale, severity, and corporate trauma evident in the cases involving Department of Justice investigations, thousands of lawsuits, corporate whistleblowers, or investor consequences. But the scale, severity, and corporate trauma evident in <u>Pettry</u>, <u>UnitedHealth</u>, and <u>Jacob</u> bolstered the credibility of the stockholders' assertions of wrongdoing in ways Thompson lacks. These cases show Delaware courts in Section 220 cases rely on a qualitative assessment of the credibility of the information and sources of information disclosed in other lawsuits. Thompson either lacks similar corroboration, or, in the case of <u>Vance</u>, is countered by a merits determination that there was no wrongdoing. Because Thompson relies on allegations that are unsupported or that were not borne out by the evidence, she does not establish a preponderance of evidence supporting her asserted credible basis.

A different situation was presented in <u>Elow v. Express Scripts Holding Co.</u>, in which the court concluded the pleadings in a separate lawsuit, coupled with the statements made by the defendant's management, satisfied the credible basis standard. No. 12721-VCMR, 2017 WL 2352151, at *6 (Del. Ch. May 31, 2017),

21

abrogated on other grounds by Tiger v. Boast Apparel, Inc., 214 A.3d 933 (Del. 2019). Express Scripts entered into a 10 year contract with Anthem to provide pharmacy benefit management services. Id. at *1. Express Scripts began negotiations with Anthem for periodic pricing review. Id. at *2. During negotiations, Express Scripts made public statements assuring its "great relationship with Anthem." Id. at *2. Negotiations failed, and Anthem initiated litigation alleging Express Scripts had acted in bad faith and breached the contract. Id. A class action lawsuit alleged Express Scripts violated federal securities laws by representing the Anthem relationship was strong and accounting for the Anthem agreement's renewal in its financial statements. Id. at *3. Anthem's lawsuit evidenced Anthem's dissatisfaction with the relationship, contradicting Express Scripts' public representations. That Anthem's statements came in a lawsuit perhaps made them more convincing, but the statements were probative because Anthem made them. Thompson makes no analogous showing.

B

Thompson additionally relies on Amazon's admissions in answer to her Section 220 complaint concerning Amazon's downloading the IBM dataset and that dataset including certain metadata. In Jacob, five months after the publication of the short-seller's report, the company filed a Form 8-K with the SEC disclosing that certain of its earlier filed financial statements " 'should no longer be relied upon due to an error in accounting for the Company's Managed Services Agreements.' " 2021 WL 733438, at *3 (quoting the Form 8-K). This was not directly responsive to the criticisms of the short-seller's report, but the Court of Chancery relied on it

22

in part as supporting a credible basis of wrongdoing because it signaled concern with the robustness of the company's independent controls on financial reporting. Id. at *3, *7. Even then, the Court of Chancery described the significance of the subsequent Form 8-K as "debatable." Id. at *7. Here, the admissions by Amazon in response to Thompson's Section 220 complaint are both more modest and less compelling than the company's SEC filing acknowledging financial reporting deficiencies in Jacob. Thompson interprets Amazon's admissions as admitting it received, and possesses, biometric information from the IBM dataset. However, Amazon's answer did not admit receiving information that would be classified as biometric for purposes of BIPA. Amazon has never disputed it obtained the IBM dataset. But it has consistently denied violating BIPA, and the court in Vance concluded there was no question of fact about its not having done so by obtaining the IBM dataset. 2022 WL 12306231, at *7. Given there is now no basis in this record for saying Amazon violated BIPA by downloading the IBM dataset, and Thompson put on no evidence that Amazon violated any other law, Amazon's admissions concerning the IBM dataset do not aid Thompson in establishing a credible basis of wrongdoing.

IV

The entire record, when evaluated in light of the Vance summary judgment order, is insufficient to establish a credible basis of wrongdoing under Delaware law. Because we conclude Thompson does not establish a proper purpose to inspect Amazon's books and records, we do not reach the scope of inspection ordered by the superior court. We vacate the superior court's order allowing

23

No. 84066-5-I/24

inspection and remand with instructions to dismiss Thompson's complaint. Because neither party prevailed based on the record that was before the superior court, the parties shall bear their own costs on appeal under RAP 14.2.

_Birk, J._

WE CONCUR: